IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JACQUELINE DAMON,

                Plaintiff,

     vs.

NAVSAV HOLDINGS, LLC,

                Defendant.

**8:23CV351**

**MEMORANDUM AND ORDER ON
MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION
FOR PRELIMINARY INJUNCTION**

       This is the third action originating in state court in which a former employee of a Texas insurance company doing business in Nebraska is suing her former employer to bar enforcement of restrictive covenants in her employment contract based on her assertion that the restrictive covenants are unenforceable under Nebraska law.[1] Unlike the plaintiffs in the companion cases, the former employee in this action did not obtain an *ex parte* temporary restraining order from the state court before the former employer removed the action to this federal court. Thus, this case is before the Court on Plaintiff Jacqueline Damon's Motion for Temporary Restraining Order and Motion for Preliminary Injunction. Filing 4. The Court held a hearing on Damon's Motion for Temporary Restraining Order and Motion for Preliminary Injunction immediately following a joint hearing on the other former employees' Motions for Preliminary Injunctions. For the reasons stated below, the Motion for Temporary Restraining Order is denied as moot and the Motion for Preliminary Injunction is granted.

---

[1] The other comparable actions are *Beber v. NavSav Holdings, LLC*, Case No. 8:23cv323, and *Roach v. NavSav Holdings, LLC*, Case No. 8:23cv325. Any information about Beber and Roach mentioned in this decision is drawn from the Court's Memorandum and Order on Motion for Preliminary Injunctions filed in both cases.

## I.  INTRODUCTION

### A.  Factual Background

This statement of the factual background is drawn from the Complaint in this action and the evidence submitted at the preliminary injunction hearing. The Court's factual findings in this decision are provisional and not binding in future proceedings. *See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)* ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits[.]") (citations omitted); *SEC v. Zahareas, 272 F.3d 1102, 1105 (8th Cir. 2001)* (same). Unless expressly indicated otherwise, these facts are deemed undisputed for present purposes.

     *1.     Damon's Employment with Universal Group, Ltd.*

         a.   Damon's Duties

Like Austin Beber and Cody Roach, the other two former employees suing defendant NavSav Holdings, LLC, in separate actions, prior to Damon's employment with NavSav, Damon was an at-will employee of Universal Group, Ltd., (Universal). Filing 16 at 3 (¶ 2). Damon who was then a resident of Omaha, Nebraska, started working for Universal in 2014. Filing 16 at 3 (¶ 2). That same year, Universal promoted Damon to the position of Account Manager, a position sometimes referred to a Lead Marketing CSR, which is a non-sales position. Filing 16 at 3 (¶ 2). In contrast, Beber and Roach were both insurance account representatives for Universal prior to their employment with NavSav. Damon's employment duties at Universal were administrative and included servicing Universal's commercial accounts, submitting claims, and addressing billing issues, almost exclusively for Austin Beber. Filing 16 at 3 (¶ 2). Damon avers that at no time did her employment duties involve trying to solicit or procure policies or clients and that she was never paid commissions because she never had nor had she ever undertaken sales responsibilities. Filing 16 at 3 (¶ 2).

Damon obtained a Nebraska resident license from the Nebraska Department of Insurance on October 16, 2014, so that she could perform services for Universal as an account manager for property, casualty, and personal lines of insurance. Filing 16 at 3 (¶ 3). Damon has maintained that license to date, although she converted it to a non-resident license in 2016 after she moved to Ankeny, Iowa. Filing 16 at 3–4 (¶ 3). From the time of issuance "to date," that license identifies Damon's business address as Universal's Omaha office location; her business fax number as Universal's Omaha office fax number starting with the Nebraska "402" area code; and her business phone number as her cell phone number starting with the Nebraska "402" area code. Filing 16 at 4 (¶ 3); *see also* Filing 16 at 4 (¶ 5).

When Damon moved to Ankeny, Iowa, in March or April of 2016, she began working remotely for Universal from her home. Filing 16 at 4 (¶ 4). However, she remained assigned to Universal's Omaha office location as her primary office and throughout her employment with Universal she was occasionally physically present at Universal's Omaha office location as part of her employment duties. Filing 16 at 4 (¶ 4). While Damon was employed with Universal, she was referred to as a member of the "Nebraska Team" and Universal published materials (*e.g.*, the business website) to the public with that reference about her. Filing 16 at 4 (¶ 6). Also, Universal provided Damon with business cards that noted her business location as the Universal Omaha office location and phone number. Filing 16 at 4 (¶ 7). At all times during Damon's employment with Universal, Universal provided her with an email signature block that noted her business location as the Universal Omaha office location and phone number. Filing 16 at 4 (¶ 8).

b.  Damon's Universal Agreements

Although Damon made no mention of it in her declaration, NavSav asserts that Damon signed a "non-solicitation" agreement with Universal on March 21, 2022, that is, shortly before the sale of Universal to NavSav on or about April 14, 2022. *See* Filing 9-5. NavSav also asserts

3

that as part of the NavSav purchase, Universal assigned to NavSav all right, title, and interest to

non-competition, confidentiality, non-disclosure, and other employee restrictive covenants held

by Universal. Filing 9-1 at 2 (¶ 8); Filing 9-3 (assignment). Damon disputes that the Universal

Agreements were effectively assigned to NavSav. Filing 18 at 12. The Court will address that

issue in its legal analysis.

The provision of the March 21, 2022, Agreement that NavSav identifies as the "Damon

Nonsolicitation Agreement" and argues is relevant here is the following:

> **6. <u>Noncompetition for Certain Universal Group Customers.</u>** Upon termination
> of employment hereunder, either voluntary or involuntarily, and for whatever
> reason, Employee agrees that for a period of one (1) year following such
> termination, he [sic] will not, without the written consent of Universal Group,
> directly or indirectly, solicit or accept any business as described in paragraph 3.
> hereof, or perform any of the services so described for any Universal Group
> Customers with whom he [sic] has had business or personal relations during the
> term of this Agreement.

Filing 9-5 at 2 (¶ 6) (underlining in the original). Paragraph 3 cross-referenced in this provision

states the following definition:

> **3. <u>Universal Group Business.</u>** All business, fees, and premiums, including
> insurance, bond, risk management, self insurance, consulting, brokerage and all
> other services (collectively the "Universal Group Business"), produced, transacted
> or received through the efforts of Employee, shall be the sole property of
> Universal Group.

Filing 9-5 at 1 (¶ 3) (underlining in the original).

Dan Headlee, NavSav's Vice President of Commercial Sales, was the owner and operator

of Universal prior to its sale to NavSav. Filing 9-1 at 1 (¶¶ 1–2). Headlee avers that Damon also

signed a Proprietary Information Agreement, but he does not identify any specific provision of

that agreement as relevant to the present dispute. Filing 9-1 at 2 (¶ 11); *see also* Filing 9-4

(Proprietary Information Agreement). NavSav has not clarified what role it believes Damon's

Proprietary Information Agreement plays in the determination of any issue concerning the

motion presently before the Court. *See generally* Filing 8. Thus, the Court will not quote or consider any provisions of that agreement.

        2.     *Damon's Employment with NavSav*

        a.  Damon's Duties with NavSav

Damon avers that on or before April 11, 2022, her employment with Universal ended and on or about April 12, 2022, her employment with defendant NavSav began. Filing 16 at 5 (¶ 9). In his declaration, Headlee states that NavSav purchased the assets of Universal on or about April 14, 2022. Filing 9-1 at 1 (¶ 5). NavSav is in the business of selling insurance products throughout the United States. Filing 9-1 at 1 (¶ 6). Damon alleges in her Complaint that NavSav is a limited liability company with its principal place of business in Beaumont, Texas, but it is certified to transact business in Nebraska and has been so certified since April 28, 2022. Filing 1-1 at 1 (¶¶ 1–2). Damon alleges that NavSav maintains a registered agent in an office in Douglas County, Nebraska, leases an office in Omaha, Douglas County, Nebraska, at which it conducts the business of selling insurance policies to individuals and businesses in Nebraska, and maintains the inactive tradename "Universal – Nebraska" in Nebraska. Filing 1-1 at 1 (¶¶ 3–4).

Damon avers that her position with NavSav was Account Manager, a position sometimes referred to as a Lead Marketing CSR. Filing 16 at 5 (¶ 9). Damon avers that this was a non-sales position, involving administrative duties, including servicing NavSav's commercial accounts, submitting claims, and addressing billing issues, almost exclusively for Austin Beber. Filing 16 at 5 (¶ 9). She avers further that at no time did her employment duties with NavSav involve trying to solicit or procure policies or clients and she was never paid commissions because she never had nor had she ever undertaken sales responsibilities. Filing 16 at 5 (¶ 9). Damon also avers that at all times during her employment with NavSav, while she was assigned to be the

Account Manager for Austin Beber, she also provided "filled-in administrative support" for other producers on occasion. Filing 16 at 5 (¶ 10).

Damon avers that at all times during her employment with NavSav, 95% or more of the work she performed for NavSav was for customers based in Nebraska, with only 4–5% of customers based in Iowa, that she was never assigned to nor did work for customers in Texas, and that she was never licensed in Texas. Filing 16 at 5 (¶ 10). She also avers that while employed at NavSav, she was assigned to the "Universal" Omaha office location, NavSav referred to her as a member of the "Nebraska Team," and NavSav published materials (e.g., the business website) to the public with that reference about her. Filing 16 at 4 (¶ 6). Damon avers that NavSav provided her with business cards that noted her business contacts as the "Universal" Omaha office location and phone number. Filing 16 at 4 (¶ 7). On the other hand, Headlee avers that at the time of her resignation, Damon was an "Iowa-based employee," that NavSav withheld taxes for her pursuant to Iowa law, and that Damon worked out of her home in Iowa servicing NavSav's customers. Filing 9-1 at 4 (¶ 15).

b.   Damon's NavSav April Agreement

Damon alleges that after NavSav acquired Universal, NavSav presented her with NavSav form employment-related agreements, which Damon completed, signed, dated, and returned to NavSav, all after her employment with NavSav had begun and all without consideration for those agreements. Filing 1-1 at 3 (¶ 17). Those agreements included a NavSav form Non-Competition, Non-Solicitation, Confidential and Non-Disclosure Agreement (the April Agreement). Filing 1-1 at 29; Filing 9-6. The April Agreement for Damon states that it was "entered into" on April 14, 2022. Filing 1-1 at 29. The electronic record of the document execution indicates that the Agreement was provided to Damon on April 18, 2022, and that she signed it that same day. Filing 1-1 at 37.

6

The restrictive covenants in the April Agreement for Damon include the following non-competition provision:

> **4.(a).   Covenant Not to Compete; Area Restriction.** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation, engage, participate, be employed by, be an agent of or manager for, be a producer for, or own an interest in any business in competition with the business of Employer for a period of one (1) year from the date of Employee's last date of employment with NavSav, and within a five (5) mile radius of Employee's primary office location during Employee's employment. For purposes of clarity, the one (1) year and five (5) mile restrictions are combined and read together as one (1) restriction, i.e. Employee cannot open or work for an insurance agency that is both within the five (5) mile radius and within one (1) year of employment. "Business of the Company" shall include, but not be limited to, an insurance agency or other similar business engaged in the sale and service of insurance and insurance related products, services, and policies.
>
> Employee understands the nature and extent of selling insurance products and insurance services out of a certain geographical location. Employee agrees that the covenant not to compete that limits employment for one (1) year within five (5) miles of Employee's last location is not an industry wide exclusion because: (1) Employee recognizes and understands he/she can work outside the five (5) mile radius; and (2) due to the nature of selling insurance, the limitation is necessary to protect the legitimate business interest of Employer to keep Employee from selling to the same territory of customers as Employee did prior to termination.

Filing 1-1 at 29–30 (bold and underlining in the original).

The April Agreement also includes the following non-solicitation provisions:

> **4.(b).   Covenant Not to Solicit; Customers.** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation, solicit or attempt to solicit, the transfer of any customers or policies, cancellation of customers or policies or writing of new insurance policies for any customer that is a part of any book of business owned by NavSav or a NavSav related or affiliated entity, or divert (or attempt to divert) any customer that is a part of any book or business owned by NavSav or a NavSav related or affiliated entity from continuing to do business with Employer for a period of five (5) years from Employee's last date of employment with Employer. Employee specifically agrees that because of the nature of NavSav and the agency Employee is working for, Employee will have access to all customers of NavSav, not just specific

customers that Employee has had contact with. If this provision is required to be reformed, to reflect that it applies to customers that the Employee had contact with or dealt with, Employee agrees and acknowledges that Employee will have contact with all customers at any agency or location when Employee is employed. Employee agrees that "customers Employee had contact with" is every customer in every location where Employee has or will work.

Additionally, Employee agrees that due to the nature of Employer's business it is not possible to limit any of the non-compete or non-solicitation provisions in this Agreement to just customers with whom Employee had dealings because Employee will most likely have dealings, contacts and access to all customers of Employer.

Employee specifically agrees and acknowledges that protecting against the solicitation of all Employer's customers is a legitimate business interest worthy of a covenant not to compete.

**4.(c).   Covenant Not to Solicit; Employees.** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation solicit or attempt to solicit, hire, or attempt to hire, any agency producers, agents, employees, or staff members of NavSav or any NavSav related entity for a period of five (5) years from Employee's last date of employment with Employer.

Filing 1-1 at 30 (bold and underlining in the original).

Other provisions pertinent here are the following choice-of-law and forum-selection provisions:

**17.     Choice of Law.** The legality of this Agreement and of any other terms or provisions, as well as the rights and duties of the parties hereunder, shall be governed by the laws of the State of Texas.

**18.     Jurisdiction.** The parties consent to the exclusive jurisdiction and venue of District State Court located in Jefferson County, Texas in any action arising out of or relating to this Agreement. The parties waive any other venue to which either party might be entitled by domicile or otherwise and the parties agree that venue for any dispute related to this Agreement is <u>mandatory</u> in a District Court located in Jefferson County, Texas.

Filing 1-1 at 35–36 (bold and underlining in the original).

The last provision of the April Agreement of interest here is the following definition of "affiliates" of NavSav:

21.   **Employer Affiliates.** In this Agreement, no matter what entity is listed as Employer, "Employer" means NavSav Holdings, LLC, NavSav Holdings II, LLC, NavSav Holdings, III, LLC, NavSav, LLC or any NavSav related or affiliated entity.

Filing 1-1 at 36 (bold and underlining in the original). Damon avers that at no time during her employment with NavSav was she ever employed by or paid wages from nor did she provide services to "NavSav Holdings II, LLC, NavSav Holdings, II, LLC, NavSav, LLC, or any NavSav related or affiliated entity" as referenced in § 4 and § 21 of the NavSav April Agreement. Filing 16 at 6 (¶ 14).

Headlee avers that if Damon had not signed the April Agreement, NavSav would not have retained Damon's employment, nor would it have given her access to NavSav customers or confidential information including pricing, contract terms, and other information that is only available to NavSav employees. Filing 9-1 at 3 (¶ 14).

3.   *Damon's Resignation from NavSav and Employment with UNICO*

Although Damon does not mention resigning from NavSav in her declaration, she does aver that on or about June 19, 2023, she started new employment with UNICO Group (UNICO). Filing 16 at 5 (¶ 11). Headlee avers that Damon voluntarily resigned from NavSav, with her last day on or about June 16, 2023. Filing 9-1 at 4 (¶ 15). Headlee avers further that after Damon submitted her notice of resignation, Beber who had likewise resigned hired legal counsel to attempt a "buyout" of his book of business and to attempt to cancel the post-employment restrictive covenants of Beber, Roach, and Damon. Filing 9-1 at 4 (¶ 17);[2] *see also* Filing 16 at 22.

---

[2] Damon objected to this paragraph of Headlee's declaration as describing a conversation to which Headlee was not a party and as stating unreasonable interpretations of written statements by Damon's counsel. The part of Headlee's statement set out in the body is consistent with a "Confidential Settlement Term Sheet" offered into evidence by Damon. *See* Filing 16 at 22. Damon's objection to the remainder of ¶ 17 of Headlee's declaration, Filing 9-1 at 4 (¶ 17), is sustained. Headlee also avers "[u]pon information and belief" that Damon has been working

Damon avers that since starting work with UNICO, she has served as an Account Manager, a position sometime referred to a Lead Marketing CSR, which is a non-sales position. Filing 16 at 5 (¶ 11). She states that her employment duties at UNICO were and are administrative and include servicing UNICO's commercial accounts, submitting claims, and addressing billing issues, almost exclusively for Austin Beber. Filing 16 at 5 (¶ 11). She avers that at no time did her employment duties, nor do they now, involve trying to solicit or procure policies or clients. Filing 16 at 5 (¶ 11). Furthermore, she avers that she was never paid commissions because she has never had nor had she ever undertaken sales responsibilities. Filing 16 at 5–6 (¶ 11). Damon avers that at all times during her employment with UNICO, 99% or more of the work she has performed for UNICO was and is for customers based in Nebraska, with only 1% of customers based in Iowa. Filing 16 at 6 (¶ 11). Damon avers that she was never assigned to do nor has she done work for customers in Texas and that she was never licensed in Texas. Filing 16 at 6 (¶ 11). Damon avers that she is assigned to UNICO's "Nebraska Team," UNICO provides her a primary office at its Lincoln, Nebraska, location, and UNICO allows her to work remotely from her home in Iowa. Filing 16 at 6 (¶ 11).

## B. Procedural Background

Damon filed her Complaint in this matter in the District Court of Douglas County, Nebraska, on July 7, 2023. Filing 1-1 at 1. In her Complaint, Damon's first claim for relief is for declaratory judgment that parts of the NavSav April Agreement, including without limitation the

---

with NavSav's Iowa and Nebraska customers with whom she worked during her combined nine-year tenure with Universal and NavSav. Filing 9-1 at 4 (¶ 19). Damon objected to this paragraph as inappropriate interpretation of a communication to which Headlee was not a party. NavSav asserted that there is sufficient foundation for this statement because Headlee is constantly monitoring the taking and conversion of business by Roach and Beber. NavSav argues further that Damon avers that she is continuing to work with Beber and his book, citing Filing 16 at 3 (¶ 2). Nothing in Headlee's declaration establishes foundation for his statement in ¶ 19 of Filing 9-1 at 4. Damon's objection to this paragraph is sustained. The Court does not intend to rely on ¶ 20 of Headlee's declaration to which Damon also objected, so that objection is moot.

restrictive covenants, are invalid and unenforceable under Nebraska law, which Damon asserts applies. Filing 1-1 at 9. Damon's second claim for relief seeks temporary and permanent injunctions "restraining NavSav from (i) enforcing or threatening to enforce the restrictive covenants contained in the NavSav [April] Agreement and (ii) bringing suit against Damon in Texas and applying Texas law to enforce the restrictive covenants contained in the NavSav [April] Agreement." Filing 1-1 at 23. Damon's third claim for relief is for tortious interference with business relationships or expectancies of her employment with UNICO. Filing 1-1 at 24. Damon's fourth claim for relief is for violations of the Nebraska Wage Payment and Collection Act for actual unpaid and unused paid time off. Filing 1-1 at 27. Summons was issued on July 7, 2023, Filing 1-1 at 50, and that summons was served on NavSav by certified mail on July 10, 2023. Filing 1-1 at 55–57.

The Court and the parties know from documents filed in Roach's companion case and offered here as part of Damon's Exhibit 3 in support of her Motions that NavSav filed a Petition against Beber, Roach, and Damon, on June 26, 2023, in the District Court of Jefferson County, Texas, 58th Judicial District Court; a First Amended Petition on July 5, 2023; a Second Amended Petition on July 6, 2023; and a Third Amended Petition on July 17, 2023. The Court and the parties likewise know from documents filed in Roach's case and offered as part of Damon's Exhibit 3 in support of her Motions that in the Third Amended Complaint, NavSav asserts causes of action for breach of contract; tortious interference with contract; tortious interference with prospective business relations; and statutory trade secret misappropriation pursuant to the Texas Uniform Trade Secrets Act.

The Court and the parties know from documents filed in Roach's companion case and offered here as part of Damon's Exhibit 3 in support of her Motions that on July 6, 2023, the

Texas state court issued an Ex Parte Temporary Restraining Order against Beber, Roach, and Damon, even though Damon contends she has never been served. The Texas state court extended that Ex Parte Temporary Restraining Order on July 17, 2023, until August 1, 2023. The Texas state court's temporary restraining order required Beber, Roach, Damon, and UNICO to desist and refrain from "[c]ontacting, soliciting, attempting to divert business to themselves and providing any insurance services including writing or binding policies for any of the clients/customers that Defendants Austin Beber, Cody Roach, [and/or] Jacqueline Damon had contact with while they worked for [NavSav]." It also required them to desist and refrain from "[u]sing in any manner or disclosing any confidential information belonging to [NavSav] including customer names, customer contacts, and customer information including the use of customer information [to] Unico Group, Inc." It also required them to desist and refrain from "[m]aking any attempts to divert any customer from continuing to do business with [NavSav]."[3] By its terms, the Texas temporary restraining order has expired after the extension ordered by the Texas state court.

On August 9, 2023, NavSav removed Damon's action from Nebraska state court to this federal court. Filing 1. On August 10, 2023, Damon filed her Motion for Temporary Restraining Order; and Motion for Preliminary Injunction; and Request for Hearing Regarding Requested Issuance of a Preliminary Injunction. Filing 4. In her Motion, Damon first sought an *ex parte* temporary restraining order, with $500 cash security in lieu of bond, enjoining Navsav from taking any action to enforce the noncompetition, non-solicitation, and related covenants in her April Agreement (and her Universal Agreement) until the Court rules on whether to issue a preliminary injunction against Navsav. Filing 4 at 1. She also requested that a hearing on her

---

[3] These are the most pertinent terms of the Texas state court's temporary restraining order; this is not a complete statement of the terms of that temporary restraining order.

12

Motion for Preliminary Injunction be set at the same time as the hearings on Beber's and Roach's Motions for Preliminary Injunction in their companion cases. Filing 4 at 24.

The Court declined to enter a Temporary Restraining Order without first allowing NavSav to be heard. Filing 6 at 1. The Court also concluded that Damon's circumstances are sufficiently different from Beber's and Roach's that a separate hearing should be scheduled on her Motion for Temporary Restraining Order and her Motion for Preliminary Injunction. Filing 6 at 2. Consequently, the Court set a briefing schedule and set a hearing on Damon's Motion for Temporary Restraining Order and Motion for Preliminary Injunction just after the hearing scheduled on Beber's and Roach's Motions on August 18, 2023. Filing 6 at 2–3. The parties made their pre-hearing submissions, and the Court held the Temporary Restraining Order and Preliminary Injunction Hearing as scheduled on August 18, 2023. The Court now provides its written disposition of the Damon's Motions.

## II.  LEGAL ANALYSIS

### A.  Damon's Motion for Temporary Restraining Order Is Moot

The Court had not ruled on Damon's Motion for Temporary Restraining Order prior to the hearing on August 18, 2023. At the hearing, Damon's counsel stated that, while Damon was not withdrawing her request for a temporary restraining order, in light of the hearing and the Court's indication that it would likely rule on the Motion for Preliminary Injunction within a week, the temporary restraining order had in a sense converted or just merged into a preliminary injunction. The Court agrees that this ruling on Damon's Motion for Preliminary Injunction essentially moots Damon's Motion for Temporary Restraining Order. Any preliminary injunctive relief issued at this point will be in the form of a Preliminary Injunction. Damon's Motion for Temporary Restraining Order is denied as moot.

### B.  Preliminary Injunction Standards

Turning to Damon's Motion for Preliminary Injunction, Federal Rule of Civil Procedure 65 authorizes the courts to issue preliminary injunctions, but it does not identify the standards the courts must apply in deciding whether or not to grant a request for a preliminary injunction.[4] The Eighth Circuit Court of Appeals has done so, however, explaining that the standards involve consideration of what are usually described in this Circuit as the "*Dataphase* factors": "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (explaining that "the standard for analyzing a motion for a temporary restraining order is the same as [the standard for analyzing] a motion for a preliminary injunction"). This formulation is similar but not identical to the formulation of the pertinent factors by the Supreme Court more than a quarter century later in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008): *Winter* states that to obtain either a TRO or a preliminary injunction, "[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (bracketed numbers inserted); *see also Tumey*, 27 F.4th at 664 (quoting *Winter*, 555 U.S. at 20, and also

---

[4] Rule 65 provides, in part, "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Rule 65(a)(2) also provides for consolidation of the preliminary injunction hearing with trial on the merits. Fed. R. Civ. P. 65(a)(2). The adverse party here, NavSav, has received notice of the request for a preliminary injunction; no party has suggested that the preliminary injunction hearing should be consolidated with trial on the merits; and the Court does not find such consolidation to be appropriate.

citing *Dataphase*, 640 F.2d at 114). No single factor is dispositive, whether the factors are drawn from *Winter*, *see Tumey*, 27 F.4th at 665, or from *Dataphase*, *see Ng*, 64 F.4th at 997.[5]

In addition to these factors, it is well to remember that "[a] preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant," here Damon. *Ng*, 64 F.4th at 997 (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)); *Tumey*, 27 F.4th at 664. Because it is an extraordinary remedy, it is "never awarded as of right." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022), in turn quoting *Winter*, 555 U.S. at 24). Furthermore, "[t]he goal of a preliminary injunction is 'to preserve the status quo until the merits are determined.'" *Ng*, 64 F.4th at 997 (quoting *Dataphase*, 640 F.2d at 113); *Tumey*, 27 F.4th at 664. Consequently, a court must be "mindful that a movant carries a 'heavier' burden when granting a preliminary injunction has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *H&R Block*, 58 F.4th at 946.

This is a case in which granting the requested preliminary injunction has the effect of awarding the movant substantially the relief she could obtain after a trial on the merits finding the restrictive covenants at issue unenforceable. Thus, the Court will be mindful of the movant's "heavier" burden, *id.*, as the Court considers the relevant factors in turn.

---

[5] Although *Winter* and *Dataphase* identify the same considerations, the two decisions address those factors in different order and slightly different language, so that it may be appropriate to refer to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20, with *Dataphase*, 640 F.2d at 20.

**C. Likelihood of Success on the Merits**

*1.    Applicable Standards*

As to the first factor under *Winter* and the third factor under *Dataphase*, the Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting R*ichland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). The likelihood of success on the merits necessarily looks at the law applicable to the claims that are the basis for preliminary injunctive relief. *See, e.g., H&R Block*, 58 F.4th at 946 (beginning its analysis of probability of success on the merits with a recitation of trademark infringement law); *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). In considering the "likelihood of success on the merits," the Court is not predetermining which party will prevail; again, the Court is only considering whether a movant's showing is sufficient to demonstrate that the movant has "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC*, 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041).

*2.    The Applicable Law Is Nebraska Law not Texas Law or Iowa Law*

Before the Court can determine whether Damon is likely to succeed on the merits of her claims under the applicable law, *see H&R Block*, 58 F.4th at 946; 301, 712, 2103 & 3151 *LLC, 27 F.4th at 1383*, the Court must determine what state's law is applicable. In her opening brief, Damon assumed that the question was whether Nebraska law or Texas law should apply, where she worked for a Nebraska company on policies primarily for Nebraska companies, even though

she lives in Iowa. *See, e.g.*, Filing 4 at 3–4, 6, 10–12. She did not consider the possibility of application of Iowa law. *See generally* Filing 4. In contrast, NavSav took the position in its opposition brief and at the preliminary injunction hearing that the question was whether Iowa law or Texas law should apply because NavSav argues that Nebraska had no sufficient interest to warrant application of Nebraska law. *See, e.g.*, Filing 8 at 1, 10. NavSav contends that Damon is an Iowa employee for NavSav, where she was located in Iowa, resided in Iowa, and had Iowa taxes withheld. Filing 8 at 4 (¶ 9), 9. The Court begins its analysis with the question of what state's choice-of-law rules apply.

> a. Nebraska Choice-of-Law Rules must be Applied Because of an "Actual Conflict" between Nebraska Law and Texas or Iowa Law

When federal jurisdiction is based on diversity—as it is here, *see* Filing 1 at 1 (¶ 3)—federal courts apply the forum's choice-of-law rules. *Rey v. Gen. Motors, LLC*, No. 22-1563, 2023 WL 5157580, at *4 (8th Cir. Aug. 11, 2023). This is true even when there is a choice-of-law provision in a contract involved in the parties' dispute. *See C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1149 (8th Cir. 2023) (explaining that a court must first examine the forum state's choice-of-law rules before deciding whether to enforce a choice-of-law provision in a contract).

As the Nebraska Supreme Court has explained,

> In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states. An actual conflict exists when a legal issue is resolved differently under the law of two states.

*Fredericks Peebles & Morgan LLP v. Assam*, 915 N.W.2d 770, 780 (Neb. 2018) (citing *O'Brien v. Cessna Aircraft Co.*, 903 N.W.2d 432, 458 (Neb. 2017)). Determining whether there is an actual conflict between the laws of the states is appropriate "before [a court] entangl[es] itself in messy issues of conflict of laws." *Am. Nat. Bank v. Medved*, 801 N.W.2d 230, 238 (Neb. 2011).

The Nebraska Supreme Court has also explained, "Once a court determines there is a conflict of law between two states, the next step is to classify the nature of the specific conflict issue, 'because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.'" *O'Brien*, 903 N.W.2d at 459 (quoting *Johnson v. United States Fidelity & Guar. Co.*, 696 N.W.2d at 437 (Neb. 2005)).

In this case, Damon argues—and the Court finds—that there is a real conflict between the laws of Nebraska, the forum state, and Texas, the state NavSav asserts provides the governing law via a choice-of-law provision in the April Agreements. *Compare* Filing 4 at 3–4, *with* Filing 8 at 6. As the Nebraska Supreme Court has explained,

> This court has long held that it is not the function of the courts to reform a covenant not to compete in order to make it enforceable. We have declined to apply the "'blue pencil' rule," which allows for the reformation of covenants to make them enforceable, stating that "we must either enforce [a covenant] as written or not enforce it at all." We have found that "reformation is tantamount to the construction of a private agreement and that the construction of private agreements is not within the power of the courts."

*Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 441 (Neb. 2015) (quoting *CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652, 655–656 (Neb. 1994)). In contrast, a Texas statue provides in pertinent part,

> (c) If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief.

Tex. Bus. & Com. Code Ann. § 15.51(c). This is a case in which "[a]n actual conflict exists" because "a legal issue," that is, whether a restrictive covenant can be reformed, "is resolved

18

differently under the law of two states." *Fredericks Peebles & Morgan LLP*, 915 N.W.2d at 780 (citation omitted).

NavSav acknowledges that Iowa and Texas law are aligned on this issue. Filing 8 at 12. In *Thrasher v. Grip-Tite Mfg. Co*., 535 F. Supp. 2d 937 (S.D. Iowa 2008), on which NavSav relies, the United States District Court for the Southern District of Iowa stated, "Unlike Nebraska, where the court is not empowered to modify or reform the non-compete agreement to make it enforceable, in Iowa, the court may modify the covenant to make it no more restrictive than necessary." 535 F.2d at 943 (citing *Presto–X–Co. v. Ewing*, 442 N.W.2d 85, 90 (Iowa 1989), among other cases). Still further, the Eighth Circuit Court of Appeals has declined to apply Iowa law, where it was the choice of law in the parties' contract, because it conflicted with Nebraska law where Iowa law allows for modification of an overly restrictive trade covenant to allow its partial enforcement but Nebraska law does not. *Rain & Hail Ins. Serv., Inc. v. Casper*, 902 F.2d 699, 701 (8th Cir. 1990).

Thus, Nebraska choice-of-law rules must be applied to determine what state's law applies because there is an "actual conflict" of laws of the nominee states.

### b.   The Case Is Properly Classified as Contractual

Because the Court has determined that there is an "actual conflict" between the laws of Texas and Iowa on the one hand and Nebraska on the other that is pertinent to the parties' dispute, the Court's next step is "to classify the nature of the specific conflict issue, 'because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.'" *O'Brien*, 903 N.W.2d at 459 (quoting *Johnson*, 696 N.W.2d at 437). Although the parties' dispute involves a tort claim, tortious interference with contractual relations, *see* Filing 1-1 at 24 (third cause of action), the gravamen of the parties' dispute is a contract claim involving non-competition and non-solicitation agreements. *See* Filing 1-1 at 9 (setting out the

first claim as one for declaratory judgment that parts of the NavSav April Agreement, including without limitation the restrictive covenants, are invalid and unenforceable under Nebraska law, which Damon asserts applies); Filing 1-1 at 23 (setting out the second claim as one seeking temporary and permanent injunctions "restraining NavSav from (i) enforcing or threatening to enforce the restrictive covenants contained in the NavSav [April] Agreement and (ii) bringing suit against Damon in Texas and applying Texas law to enforce the restrictive covenants contained in the NavSav [April] Agreement."). Thus, Nebraska's choice-of-law rules for contract cases apply here.

### c. Nebraska Choice-of-Law Rules for Contract Cases Require Application of Nebraska Law

The Nebraska Supreme Court observed,

> We have recognized that persons residing in different states may select the law of either state to govern their contract and that the parties' choice of law will govern. This principle is consistent with Restatement (Second) of Conflict of Laws § 187[.]

*Medved*, 801 N.W.2d at 236. The Nebraska Supreme Court expressly adopted § 187. *Id.*

That is not to say that the parties' choice of law in a contract will always govern, because Restatement (Second) of Conflict of Laws § 187 states exceptions. Specifically, § 187 provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> > (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which,

> under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187 (1971); *Medved*, 801 N.W.2d at 236–237 (quoting this provision). As the Nebraska Supreme Court has explained,

> Under the Restatement, in the absence of an effective choice of law by the parties, a court is to consider several contacts in determining the law applicable to an issue. These contacts include (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*In re Est. of Greb*, 848 N.W.2d 611, 622 (Neb. 2014) (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)).

### i.   Nebraska's Interest is Greater than Texas's Interest

Neither Damon nor NavSav argues that § 187(1) applies in this case. The analysis in *Medved* as to why § 187 dictated application of Nebraska law, and whether that conclusion was based on § 187(1) or § 187(2), is not clear, where the contract between the parties in that case specifically provided that it was to be governed by Nebraska law. 801 N.W.2d at 237. Nevertheless, this Court is not left wholly without guidance.

In *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892 (8th Cir. 2006), the Eighth Circuit Court of Appeals explained that the district court had applied § 187(2) without analyzing whether § 187(1) applied. 435 F.3d at 896. The Eighth Circuit found that this omission was problematic, because "[s]ection 187(2) applies only when section 187(1) does not govern." *Id.* (citing Restatement § 187, comment d). The court then held,

> Section 187(1) is inapplicable in this case, because, under Nebraska law, the parties could not have resolved to apply Ohio law even with an explicit provision. *See CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 518 N.W.2d 652, 656 (1994) (holding "[t]he provision of the agreement which states that a court may reform the covenant is of no effect. Private parties may not confer upon the court powers which it does not possess."); *see also Baxter Intern., Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir.1992).

21

*Castillo*, 435 F.3d at 896. Likewise, in this case, the Court cannot apply Texas law, even though Texas is the law explicitly chosen in the parties' April Agreement, because this Court cannot reform the covenants at issue under Nebraska law even if the Court would have that power under Texas law. *Id.* Thus, the Court's analysis will focus on § 187(2).

In *Castillo*, the Eighth Circuit held that § 187(2)(a) applied because the case met the requirement that "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Id.* This was so for the following reasons:

> Nebraska has a substantial relationship to the parties and the transaction, because the former employees and DCS entered into the Agreements in Nebraska, the services at issue were to be performed in Nebraska, the former employees reside in Nebraska, the prohibition of the noncompete clause directly and materially affects employment in Nebraska, and DCS does business in Nebraska. Nebraska clearly possesses a direct and substantial interest in the employment of its citizens. The only relationship between Ohio and the parties is the location of DCS's corporate headquarters and principal place of business in Ohio.

*Castillo*, 435 F.3d at 896. The Eighth Circuit found these factors were relevant, because they were considered by the Nebraska Supreme Court in *Powell v. Am. Charter Fed. Sav. & Loan Ass'n*, 514 N.W.2d 326, 332 (Neb. 1994). *Castillo*, 435 F.3d at 896. In *Powell*, the Nebraska Supreme Court drew these factors from Restatement (Second) of Conflict of Laws § 188. 514 N.W.2d at 331 (citing § 188 and *Shull v. Dain, Kalman & Quail, Inc.*, 267 N.W.2d 517, 520 (Neb. 1978)). In *Castillo*, the Eighth Circuit Court of Appeals concluded that "[u]nder these circumstances, the district court properly concluded Ohio has no substantial relationship to the parties or the transaction, and Nebraska has a greater material interest in the Agreements." *Id.*

For precisely the same reasons, this Court now concludes that Nebraska has a greater material interest in the April Agreements than Texas does. There is no evidence that Damon entered into the April Agreement in Texas rather than Nebraska, where Damon was assigned to

and did work for the Nebraska office. *See id.*; *see also* Filing 16 at 4–5 (¶¶ 6–8, 10–11). The

services at issue were to be performed by Damon at least partly in Nebraska and never in Texas.

*See id.*; *see also* Filing 16 at 5 (¶¶ 10–11). While it is true that Damon does not reside in

Nebraska, *see id.*, the prohibition of the noncompete clause directly and materially affects

employment in Nebraska. *See id.*; see also Filing 16 at 4–5 (¶¶ 6–8, 10–11). Finally, NavSav

does business in Nebraska. *See id.*; *see also* Filing 16 at 6 (¶ 12).

In *Castillo*, the Eighth Circuit concluded that the conditions set out in § 187(2)(b) were

also met. *Id.* The court explained,

> Under section 187(2)(b), application of the chosen law is precluded if "application
> of the law of the chosen state would be contrary to a fundamental policy of a state
> which has a materially greater interest than the chosen state" when the factors
> articulated in section 188 are applied. Restatement § 187(2)(b). Nebraska and
> Ohio courts have materially different approaches to the reformation of
> unreasonable noncompete agreements. In Nebraska, if a court determines a
> noncompete agreement is unreasonable, the court will not reform the noncompete
> agreement in order to make it enforceable. *H & R Block Tax Servs., Inc., v. Circle
> A Enters., Inc*., 269 Neb. 411, 693 N.W.2d 548, 552 (2005). Contrary to the
> Nebraska courts' approach, Ohio courts are empowered to reform overly broad or
> unreasonable noncompete agreements to make them reasonable. *Raimonde v. Van
> Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975). The district court correctly
> recognized that because Nebraska courts expressly have rejected judicial
> reformation of noncompete agreements, application of Ohio law would violate a
> fundamental policy of Nebraska law.

*Castillo*, 435 F.3d at 896–97.

Again, precisely the same is true here. The Eighth Circuit identified as a fundamental

policy of the state of Nebraska that a noncompete agreement that is unreasonable cannot be

reformed in order to make it enforceable. *Id.* at 897; *see also Waadah*, 861 N.W.2d at 441

(explaining that "we must either enforce [a covenant] as written or not enforce it at all" (quoting

*CAE Vanguard, Inc*., 518 N.W.2d at 655–656)). On the other hand, Texas (like Ohio) allows

"blue-penciling" of restrictive covenants to make them reasonable. *See id.*; *see also* Tex. Bus. &

Com. Code Ann. § 15.51(c). "[B]ecause Nebraska courts expressly have rejected judicial

reformation of noncompete agreements, application of [Texas] law would violate a fundamental policy of Nebraska law." *Id.*

ii.   Nebraska's Interest Is Greater than Iowa's Interest

Unlike the comparable cases brought by Beber and Roach, Damon's case involves a third nominee, Iowa, for application of its law under Nebraska choice-of-law rules. NavSav argues that Damon was an Iowa employee, with Iowa taxes withheld, and servicing NavSav customers from her Iowa office. Filing 8 at 1, 4 (¶ 9); Filing 9-1 at 4 (¶ 15). NavSav argues that Nebraska has no material interest in a dispute between an Iowa employee and a Texas employer. Filing 8 at 8–9. The Court finds NavSav's argument that Iowa has a greater interest than Nebraska unpersuasive.

The Court is not convinced that an employee's "teleworking," "working remotely," or "working from home" changes the employee's place of work from the state where the employee's assigned office is located, the employer conducts business, and the employer's customers are located to the place where the employee physically does the work. There would be little question that Damon's place of employment would be Nebraska if she commuted (*i.e.*, physically drove, took a bus, took a taxi or ride-sharing service, biked, or walked) daily from a residence in Council Bluffs, Iowa, across the I-80 bridge or the Bob Kerrey Pedestrian Bridge to work in Omaha, Nebraska, for a company doing business from an office in Nebraska with Nebraska customers or clients. In this case, Damon's commute was "virtual," via the telephone or internet, from her residence in Ankeny, Iowa, to her employer's place of business at an office in Omaha, Nebraska, where the employer was doing business with Nebraska customers or clients. As the nation learned from the COVID-19 crisis, in many cases, exactly the same work can be done for the same employer with the same place of business and the same customers or clients by "virtual commute." Certainly, the place of business for workers during the COVID-19

24

pandemic did not change to their physical location if they stayed away from the office for months, if not over a year, even if their pandemic abode was in a different state than their office. Although the work may be done elsewhere, the center of the business being done remains the employer's place of business where the employee is assigned not the employee's physical location.[6]

Turning to the consideration of the relevant factors under Restatement (Second) of Conflict of Laws § 188, the Court begins with the place of contracting. *See Castillo*, 435 F.3d at 896; Restatement (Second) of Conflict of Laws § 188(2)(a). NavSav argues that the place of contracting was Iowa because the last act giving the contract binding effect, Damon's execution of her April Agreement, was in Iowa. Filing 8 at 9 (citing Restatement (Second) Conflict of Laws § 188 cmt. e). NavSav's argument is based on the declaration of Ragen Murray, Vice President of Talent and Human Resources with NavSav, that "[s]ince Ms. Damon was based in Iowa, Ms. Damon, upon information and belief, received, completed, and signed her onboarding documents in Iowa." Filing 9-2 at 2 (¶ 9). However, there is no more than a belief and certainly no evidence that Damon entered into the April Agreement in Iowa rather than Nebraska, where Damon was assigned to and did work for the Nebraska office. *See Castillo*, 435 F.3d at 896; *see also* Filing 16 at 4–5 (¶¶ 6–8, 10–11). Furthermore, comment e to § 188 states that "[s]tanding alone, the place of contracting is a relatively insignificant contact." Restatement (Second) of Conflict of Laws § 188, cmt. e. Similarly, the place of negotiation is of little importance when, as NavSav assumes here, "the parties do not meet but rather conduct their negotiations from

---

[6] The Court acknowledges that this choice-of-law analysis concluding that Nebraska is Damon's place of business is not determinative of a virtual commuter's state tax responsibilities or potentially other determinations that may properly hinge upon actual location of the employee during the workday. Furthermore, while NavSav makes much of Damon's withholding of Iowa income taxes, where either party to a contract pays income taxes is not a consideration identified in Restatement (Second) of Conflict of Laws § 188(2).

separate states by mail or telephone"—or, the Court adds, over the internet or via email. *See* Restatement (Second) of Conflicts of Laws § 188(2)(b) and cmt. e.

The services at issue were to be performed by Damon at least substantially in Nebraska for Nebraska clients and much less frequently for Iowa clients, and all of them were clients of NavSav's Nebraska office. *See Castillo*, 435 F.3d at 896; Restatement (Second) of Conflicts of Laws § 188(2)(c); *see also* Filing 16 at 5 (¶¶ 10–11). Indeed, the noncompete clause NavSav is trying to enforce here seeks to stop Damon from competing within five (5) miles of its Omaha, Nebraska office. Filing 1-1 at 29. This proves that NavSav intended the location of performance to be Nebraska. Comment e to § 188 points out that "the state where performance is to occur has an obvious interest in the question whether this performance would be illegal." Restatement (Second) of Conflicts of Laws § 188, cmt. e. Furthermore, this is not a situation in which the place of performance is of little weight because "performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue." *Id.* Rather, it is a situation in which performance is centered heavily on NavSav's Nebraska office and Nebraska clients and involves much less performance for Iowa clients and then only through NavSav's Nebraska office. Filing 16 at 5 (¶¶ 10–11). Also, the location of the subject matter of the contract under § 188(2)(d) is clearly tilted toward Nebraska rather than Iowa where the vast majority of the clients Damon serviced were Nebraska clients with Nebraska insurance policies.

It is true that Damon does not reside in Nebraska. *See Castillo*, 435 F.3d at 896; Restatement (Second) of Conflicts of Laws § 188(2)(e). However, residence of the parties is only one of the factors set out in § 188(2)(e), and another is the "place of business of the parties," which is primarily Nebraska not Iowa. *See Castillo*, 435 F.3d at 896; Filing 16 at 6 (¶ 12). Finally, the prohibition of the noncompete clause directly and materially affects employment in

Nebraska. *See id.*; *see also* Filing 16 at 4–5 (¶¶ 6–8, 10–11). The Eighth Circuit identified as a fundamental policy of the state of Nebraska that a noncompete agreement that is unreasonable cannot be reformed in order to make it enforceable. *Id.* at 897; *see also Waadah*, 861 N.W.2d at 441 (explaining that "we must either enforce [a covenant] as written or not enforce it at all" (quoting *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656)). On the other hand, Iowa (like Texas) allows "blue-penciling" of restrictive covenants to make them reasonable. *See Thrasher*, 535 F.2d at 943. "[B]ecause Nebraska courts expressly have rejected judicial reformation of noncompete agreements, application of [Iowa] law would violate a fundamental policy of Nebraska law." *Cf. Castillo*, 435 F.3d at 897 (making this observation as to Nebraska and Texas law).

This fundamental policy of Nebraska is not to protect employees or only resident employees over employers but to prevent unreasonable restraints on trade in Nebraska. As the Nebraska Supreme Court explained, "We have long recognized that at common law, all contracts in restraint of trade are against public policy and void." *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014). Under Nebraska law, "[c]ovenants not to compete, as partial restraints of trade, are enforceable [only] if the covenants are reasonable." *Id.* Although the Nebraska Supreme Court recognized that its position on non-severability and refusal to reform unreasonable restrictive covenants "is the minority rule," it also recognized that the rule was "backed by important public policy considerations." *Waadah*, 861 N.W.2d at 441. The court explained that "[s]everability of [restrictive] covenants is against public policy because it creates uncertainty in employees' contractual relationships with [employers], increases the potential for confusion by parties to a contract, and encourages litigation of [restrictive] clauses in contracts." *Id.* (explaining the same policy interests supported rejection of the "blue-pencil" rule).

27

Furthermore, the Nebraska Supreme Court has found that "reformation is tantamount to the construction of a private agreement and that the construction of private agreements is not within the power of [Nebraska] courts." *Id.* (quoting *CAE Vanguard, Inc.*, 518 N.W.2d at 655). None of the reasons for this fundamental Nebraska policy is limited to Nebraska resident employees. Thus, Nebraska retains the greater interest in not enforcing or reforming unreasonable restrictive covenants, if any, in the April Contract despite Damon's Iowa residency.

> d.   Summary

After the comparable analysis in *Castillo*, the Eighth Circuit concluded, "Because Nebraska has a greater material interest in the Agreements and application of Ohio law would violate a fundamental policy of Nebraska law, we hold the district court correctly applied Nebraska law to the question of the validity and enforceability of the noncompete agreements." *Id.* Likewise, it follows that Nebraska law applies to the parties' dispute here rather than Texas law or Iowa law, even though Texas law is identified in the choice-of-law provisions of Damon's April Agreements and Iowa is Damon's place of residence. *Id.*

> 3.   *The Enforceability of the Restrictive Covenants under Nebraska Law*

Not only does Nebraska law apply but the April Agreements are unenforceable under Nebraska law. Damon argues that the April Agreement is unenforceable because the covenants were not limited to customers with whom she had a relationship while at NavSav and the April Agreements cannot be reformed under Nebraska law. Filing 4 at 14. Damon also points out in her declaration that she did not have any employment with and provided no services to NavSav's affiliates mentioned in § 21 of the April Agreement. Filing 16 at 6 (¶ 14). At the preliminary injunction hearing, Damon argued that the April Agreement is unenforceable because it unreasonably includes the books of business of NavSav's affiliates and related entities as well as

NavSav and because the five-year prohibition on solicitation is unreasonable compared to the thirteen months or so Damon worked for NavSav.

While NavSav expressly asserts that the restrictive covenants in the April Agreements are enforceable under Texas and Iowa law, *see* Filing 8 at 12, it never expressly argues that the April Agreements are enforceable under Nebraska law. *See generally* Filing 8. Instead, NavSav shifts its argument to the enforceability of the Universal Agreements under Nebraska law. Filing 8 at 22–23. The Court will address issues related to the Universal Agreements below. The first question is the enforceability of the April Agreement, however.

      a.   Applicable Standards

Under Nebraska law, "[a]n employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but [it] is not entitled to protection against ordinary competition from a former employee." *Prof'l Bus. Servs. Co. v. Rosno*, 680 N.W.2d 176, 184 (Neb. 2004); *see also Castillo*, 435 F.3d at 897 (quoting this statement from *Rosno*). To put it another way, "while not favorites of the law, partial restraints are not deemed to be unenforcible [sic] when they are ancillary to a contract of employment and are apparently necessary to afford fair protection to the employer." *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014) (quoting *Securities Acceptance Corp. v. Brown*, 106 N.W.2d 456, 462 (Neb. 1960)). Indeed, "Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment." *Waadah*, 861 N.W.2d at 443. Thus, "[w]hether a noncompete clause is valid and enforceable requires [a court] to categorize the covenant as either an employment contract or the sale of goodwill." *Id.*

Nevertheless,

> [r]egardless of the context [*i.e.*, whether employment or the sale of a business and its goodwill], a partial restraint of trade such as a covenant not to compete must meet three general requirements to be valid. First, the restriction must be reasonable in the sense that it is not injurious to the public. Second, the restriction must be reasonable in the sense that it is no greater than reasonably necessary to protect the employer in some legitimate business interest. Third, the restriction must be reasonable in the sense that it is not unduly harsh and oppressive on the party against whom it is asserted.

*Waadah*, 861 N.W.2d at 443 (concluding that the proper standard in that case was the one used for sale of goodwill); *Gaver*, 856 N.W.2d at 127 (listing the same considerations in an employment case); *see also Castillo*, 435 F.3d at 897 (noting that Nebraska imposes these requirements, citing *Rosno*, 680 N.W.2d at 184).

The Nebraska Supreme Court has suggested that it is often best to consider the second requirement "and initially determine if the restraint is in aid of some legitimate interest of the employer." *Gaver*, 856 N.W.2d at 127–28. Furthermore,

> In the past, we have determined that covenants not to compete are valid and enforceable where they were reasonably limited to restricting the former employee from contacting customers with whom the former employee had had personal contact while employed by the former employer and where they contained reasonable temporal and geographical restrictions.

*Gaver*, 856 N.W.2d at 128 (citing cases). Likewise, in *Castillo*, the Eighth Circuit explained, "A noncompete agreement 'may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact.'" 435 F.3d at 897 (quoting *Polly v. Ray D. Hilderman & Co.*, 407 N.W.2d 751, 756 (Neb. 1987)).

> b. The April Agreement Is Unenforceable under Nebraska Law

Beginning with the initial question of whether "the restraint is in aid of some legitimate interest of the employer," the non-competition provision in the April Agreement for Damon, § 4.(a)., is "ancillary to a contract of employment and [is] apparently necessary to afford fair

30

protection to the employer." *Gaver*, 856 N.W.2d at 127–28 (second requirement). Standing alone, it also does not appear to be "unduly harsh and oppressive on the party against whom it is asserted." *Waadah*, 861 N.W.2d at 443; *Gaver*, 856 N.W.2d at 127. This is so, because it "contain[s] reasonable temporal and geographical restrictions," *Gaver*, 856 N.W.2d at 128, where it applies for "a period of one (1) year from the date of Employee's last date of employment with NavSav, and within a five (5) mile radius of Employee's primary office location during Employee's employment." Filing 1-1 at 29. Indeed, Damon avers that her new place of business with UNICO is in Lincoln, Nebraska, more than five miles from her former Omaha office while employed with NavSav, so she is not in violation of this provision even if it is enforceable. Filing 16 at 6 (¶ 11). However, the non-competition provision does not satisfy the first requirement under Nebraska law where it "is . . . injurious to the public" because it does not stand alone; it is linked with non-solicitation provisions that violate Nebraska public policy. *See Gaver*, 856 N.W.2d at 127 (third requirement is that the covenant "is not injurious to the public").

The non-solicitation provision in the April Agreement is not enforceable because it is not "reasonably limited to restricting the former employee from contacting customers with whom the former employee had had personal contact while employed by the former employer." *Id.* at 128; *accord Castillo*, 435 F.3d at 897 (stating that under Nebraska law, "[a] noncompete agreement may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact" (internal quotation marks and citation omitted)). Instead, the non-solicitation provision, § 4.(b)., precludes soliciting "any customer that is a part of any book of business owned by NavSav or a NavSav related or affiliated entity, or divert[ing] (or attempt[ing] to

31

divert) any customer that is a part of any book or business owned by NavSav or a NavSav related or affiliated entity from continuing to do business with Employer for a period of five (5) years from Employee's last date of employment with Employer." Filing 1-1 at 78. This provision barring contact with "any customer that is a part of any book of business owned by NavSav" greatly exceeds the permissible scope of customers an employee may be precluded from contacting by a restrictive covenant under Nebraska law. *Gaver*, 856 N.W.2d at 128; *Castillo*, 435 F.3d at 897. Still further there is no evidence that Damon ever solicited any customers of any of NavSav's affiliates identified in § 21 of the April Agreements. Filing 1-1 at 36. Thus, the inclusion of affiliates' customers is not reasonably necessary to protect NavSav's legitimate business interests. *Gaver*, 856 N.W.2d at 128.

The Court finds that a five-year bar on contacts with NavSav customers, even if Damon had once had personal contact with them while working for NavSav, appears to be an excessive—perhaps even punitive—temporal bar, where Damon worked for NavSav only for about thirteen months. *Id.* (stating that restrictive covenants must not have unreasonable temporal limitations). The non-solicitation provision applicable to employees in § 4.(c). of the April Agreement, also for five-years, is equally unreasonable. Filing 1-1 at 30.

Again, at least for purposes of a preliminary injunction, the Court does not believe it can "blue-pencil" the April Agreement to leave just the non-competition provision, standing alone, even with its reasonable one-year and five-mile limitations without contradicting Nebraska public policy. *See Waadah*, 861 N.W.2d at 441 (explaining that "we must either enforce [a covenant] as written or not enforce it at all" (quoting *CAE Vanguard, Inc.*, 518 N.W.2d at 655–

656))[7] Thus, Damon has not just "a fair chance of prevailing," *see Wildhawk Invs.*, 27 F.4th at, 593 (defining likelihood of success), but a high probability of success on the merits of her claim that the April Agreement is unenforceable. Therefore, this *Winter* factor weighs very heavily in favor of granting the requested preliminary injunction against enforcement of the April Agreement.

### c.  The Universal Agreements Are Unenforceable Because They Are Unassignable under Nebraska Law

NavSav argues that even though Damon bases her arguments for a preliminary injunction exclusively on the April Agreement, her "likelihood of success" should also take into consideration the restrictive covenants in the Universal Agreement that was assigned to NavSav when it purchased Universal. Filing 8 at 22–23. The Court notes that—unlike Beber and Roach—Damon does not base her claims in her Complaint on the unenforceability of the Universal Agreement, even in the alternative. *See* Filing 1-1 at 9, 23. Nevertheless, for the sake of completely addressing NavSav's arguments, the Court will consider Damon's likelihood of success in light of the Universal Agreements.

The document illustrating the purported assignment of the Universal Agreements to NavSav is at Filing 9-3. NavSav argues that the Universal Agreement restricts Damon's post-employment conduct to the extent that she cannot use NavSav's confidential information or solicit NavSav customers with whom she worked during her employment. Filing 8 at 23. NavSav argues that such a restriction is enforceable under Nebraska law. Filing 8 at 22–23 (citing *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 638 (Neb. 2008), and *Chambers-Dobson v. Squier*, 472 N.W.2d 391, 399–402 (Neb. 1991)). Among other things,

---

[7] Because the Court concludes at least for purposes of a preliminary injunction that the April Agreement is not enforceable even if there was consideration for that agreement, the Court will not address Damon's further argument that there was no consideration for the April Agreement making it unenforceable.

Damon argues that the Universal Agreement cannot be assigned to NavSav and does not apply to Universal's successors or assignees. Filing 18 at 12. She argues that there is no language in the Universal Agreement that applies to Universal's successors and assignees and the covenants are directed exclusively to Universal. Filing 18 at 12. She argues further that personal services contracts cannot be assigned as a matter of law. Filing 18 at 13.

The Court agrees with Damon that the Universal Agreement is not assignable. First, *Aon Consulting*, on which NavSav relies actually applies Maryland law to the question of the assignability of a non-competition agreement. 748 N.W.2d at 637–38. NavSav has not demonstrated that there is a Nebraska statute or decision of the Nebraska Supreme Court that is similar to Maryland's statute, MD Code Corps. & Ass'ns § 3-114. *See Aon Consulting*, 748 N.W.2d at 637 ("We agree with those cases which hold, under statutes similar to Maryland's, that a covenant not to compete is an asset of a corporation which passes by operation of law to a successor corporation as the result of a merger, regardless of whether the agreement would otherwise be assignable.").

On the other hand, in *Griffeth v. Sawyer Clothing, Inc*., 276 N.W.2d 652 (Neb. 1979), the Nebraska Supreme Court found questions of fact as to the intent to assign a non-competition agreement, that is, whether it was intended that the non-competition agreement was a personal obligation not to be assigned, even though the contract for sale of the business purported to assign rights to the buyer. 276 N.W.2d at 654. The Court ultimately concluded,

> We believe that the better rule in the assignability of such contracts would be to limit that assignability strictly to the intent of the parties as disclosed by the language of the instrument if it is complete and unambiguous. Where the language in the contract regarding assignment is susceptible of more than one construction, or is vague or ambiguous, extrinsic evidence may be received for the purpose of determining the intent of the parties.

*Griffeth*, 276 N.W.2d at 655.

There is no hint of any intent to allow assignment of the restrictive covenants in the Universal Agreement, so limiting assignability strictly to the intent disclosed by the language of the instrument, the Court finds no assignment was intended. *Id.* There simply is no language in the Universal Agreements that obligates Damon to Universal's assignees or successors. *See* Filing 9-4 (proprietary information agreement); Filing 9-5 (non-solicitation agreement). This conclusion that the restrictive covenants in the Universal Agreements were not intended to be assigned is consistent with later decisions of the Nebraska Supreme Court holding that assignments for matters of personal trust or confidence or for personal services are not permissible. *See, e.g., Millard Gutter Co. v. Shelter Mut. Ins. Co*., 980 N.W.2d 420, 433 (Neb. 2022) ("[A]lthough the law generally supports the assignability of rights, it does not permit assignments for matters of personal trust or confidence, or for personal services.").

NavSav did not rely on the Universal Agreements as to Damon as the basis for its own attempt to enforce restrictive covenants in the Texas action. There is no mention of the Universal Agreements in NavSav's Third Amended Petition. *See generally* Damon's Exhibit 3. There is mention only that NavSav "purchased the assets (i.e. insurance policies) of Universal Group, Ltd.," and that Damon is a "former employee[ ] of Universal" who then executed the April Agreement with NavSav. *See* Damon's Exhibit 3.

The Court rejects NavSav's attempt to change the focus for Damon's likelihood of success from the April Agreement she had with NavSav to an agreement Damon had with NavSav's predecessor and alleged assignor Universal. Instead, the Court reiterates its conclusion that the likelihood of success factor weighs very heavily in favor of granting the requested preliminary injunction against enforcement of the April Agreements.

### D.  Irreparable Harm

*1.     Applicable Standards*

The second factor under *Winter* and the first factor under *Dataphase* is "irreparable harm." *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. As the Eighth Circuit Court of Appeals explained in Ng,

> "To establish the need for a preliminary injunction, the movant must show more than the mere possibility that irreparable harm will occur. A movant must show he is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

*Ng*, 64 F.4th at 997; *Tumey*, 27 F.4th at 664–65 (explaining that to obtain a preliminary injunction, the movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered" (quoting *Winter*, 555 U.S. at 20)). Indeed,

> To demonstrate irreparable harm, [the movant] must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief. In other words, the harm must not only be more than the mere possibility of irreparable harm, it also must be more than mere speculation.

*H&R Block*, 58 F.4th at 951 (internal quotation marks and citations omitted).

Somewhat more specifically, "[i]rreparable harm occurs when a party has no adequate remedy at law." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Thus, for example, "'[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—i.e., can be recompensed by money damages. *Wildhawk Invs., LLC*, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to

deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

> 2.     *Plaintiff Has Shown Sufficient Threat of Irreparable Harm to Warrant a Preliminary Injunction*

Because failure to satisfy this factor is independently sufficient to defeat a request for a preliminary injunction, *see Sessler*, 990 F.3d at 1156, the Court will begin by summarizing the parties' arguments on this factor. Damon argues that she will suffer irreparable harm in the absence of a preliminary injunction in the form of restraint on trade and commerce in Nebraska by applying Texas law and public policy that are inconsistent with Nebraska law and public policy; impairment or elimination of her ability to earn a living and support their families and themselves; imposition of great expense to defend against the Texas case in Texas; and a potential judgment in Texas regarding the post-employment restrictive covenants contained in the NavSav Agreement that will conflict with Nebraska law and public policy. Filing 4 at 23.

In response, NavSav argues that none of Damon's allegedly "irreparable harms" is sufficient to support a preliminary injunction. Filing 8 at 14–15. NavSav argues that Damon is not prevented from earning a living, just prevented from doing so in violation of her restrictive covenants. Filing 8 at 15. NavSav also points out that the Texas restraining order is no longer in effect, so Damon is not currently restrained from any conduct. Filing 8 at 15. NavSav argues that case law shows that defending against litigation and the costs of doing so are not irreparable harms. Filing 8 at 15–16. Indeed, NavSav points out that monetary losses rarely constitute irreparable harm within the meaning of this preliminary injunction factor. Filing 8 at 16.

In reply, Damon emphasizes the irreparable harm from the restraint on trade and commerce in Nebraska from application of Texas law and policy that is inconsistent with Nebraska law and public policy. Filing 18 at 19.

As set out above, "'[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e.*, can be recompensed by money damages. *Wildhawk Invs., LLC, 27 F.4th at 597* (quoting *DISH Network Serv. L.L.C, 725 F.3d at 882*). Thus, impairment or elimination of Damon's ability to earn a living and support herself and her family and costs of litigation generally are not sufficient to warrant a preliminary injunction, because such monetary losses can be recompensed by monetary damages. *Id.* More specifically, when an employee is wrongfully terminated—and the Court believes when an employee is wrongfully prevented from working—his or her "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 300 (8th Cir. 1996)* (quoting *Sampson v. Murray, 415 U.S. 61, 90 (1974)*).[8]

On the other hand, the Court is more persuaded by the conflict between enforcement of the restrictive covenants and Nebraska law and public policy as an "irreparable harm." In *MacGinnitie v. Hobbs Grp., LLC, 420 F.3d 1234 (11th Cir. 2005)*, the Eleventh Circuit Court of Appeals considered a request for injunctive relief from restrictive covenants in an employee's contract with an insurance brokerage firm. *MacGinnitie, 420 F.3d at 1237*. The Eleventh Circuit

---

[8] At the preliminary injunction hearing, Damon did not rely on the Court's own decision in *Bryant v. Nationwide Anesthesia Services, Inc., Case No. 8:21-cv-335, 2021 WL 3912264 (D. Neb. Sept. 1, 2021)*, as Beber and Roach had, as authority for holding that lost income can constitute irreparable harm. Her choice was wise because that decision does not help her case. In *Bryant*, the Court observed,

> Bryant had shown a threat of irreparable harm should the court fail to issue the temporary restraining order. She alleges she will be forced to resign from her current employment and will be unable to seek further employment in her specialized area. Filing 1 at 10. She claims this will result in her being unable to earn a living. Filing 1 at 10. Any such harm would be irreparable due to Bryant's complete inability to obtain employment in the entire field of her expertise. Thus, Bryant had shown a likelihood of more than financial loss but rather irreparable harm to her very livelihood and her opportunity to pursue employment in her field of expertise.

*Bryant, 2021 WL 3912264*, at *5. As the Court explained in its decision on Beber's and Roach's Motions for Preliminary Injunction, *Bryant* is distinguishable. Even if the April Agreement was enforceable, it would not force Damon to resign from her current employment with UNICO, it would not make Damon unable to seek further employment in her specialized area, and it would not make Damon unable to earn a living. *See id.*

concluded that the district court had erred in rejecting injunctive relief for lack of irreparable harm, as follows:

> Furthermore, MacGinnitie has shown irreparable harm which cannot be undone through monetary remedies, in the form of unenforceable restrictions on his access to customers, employees, and information. These injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify. Georgia public policy is clear that restrictive covenants in employment contracts are disfavored as potential restraints of trade which tend to lessen competition. Because of this public policy, the Georgia courts and this court have not hesitated to find irreparable harm in cases involving covenants not to compete.

*MacGinnitie*, 420 F.3d at 1242 (citations omitted). Similarly, in the case now before the Court, as explained above, Nebraska has a clear public policy against overbroad restrictive covenants in employment contracts as restraints on trade and will not reform them to impose only reasonable limitations. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656. Although Damon has not cited any Nebraska case that has granted a preliminary injunction on the ground that a restrictive covenant would inflict irreparable harm because it would violate Nebraska public policy, this Court predicts that the Nebraska Supreme Court would not hesitate to do so when this aspect of Nebraska public policy is so well-established.

Damon has also established sufficient threat of irreparable harm to warrant issuance of a preliminary injunction.

### E.  The Balance of Harms

The third *Winter* factor and the second *Dataphase* factor considers the "balance of equities" or the "balance of harms." *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. This factor requires the court to consider the state of the balance between the harm to the movant and the injury that granting the injunction will inflict on other litigants in the case. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022); *MPAY Inc. v. Erie Custom* Comput. *Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020). In other words, this factor asks whether "the balance of equities

tips in [the movant's] favor." *Tumey*, 27 F.4th at 664 (internal quotation marks omitted). To prevail, the movant must show that "the balance of equities so favors [the movant] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Sessler*, 990 F.3d at 1157 (quoting *Powell v. Noble*, 798 F.3d 690, 702–03 (8th Cir. 2015), in turn quoting *Dataphase*, 640 F.2d at 113).

Damon argues that while she faces a threat of irreparable harm in the absence of a preliminary injunction, NavSav faces only a minimal threat of harm if a preliminary injunction is issued. Filing 4 at 20. She argues that NavSav will be able to conduct its business, maintain its current customers, and recruit new customers. Filing 4 at 20–21. NavSav's argument is the opposite. It contends that Damon will be able to go on working, just within the parameters of the restrictive covenants, while NavSav will suffer immediate economic harm. Filing 8 at 17–18.

It is true that an employer's loss of income and goodwill because of an employee's breach of post-employment restrictive covenants may be deemed an irreparable harm. The Eighth Circuit has recognized that "irreparable harm can be inferred from a trial court's actual finding of a breach of a restrictive covenant by the defendant." *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (internal quotation marks omitted). Nevertheless, where enforcement of the restrictions in the April Agreement are deemed to exceed the valid interests of NavSav because they offend Nebraska public policy, the possibility of harm to NavSav is of little weight. *Cf. Progressive Techs., Inc. v. Chaffin Holdings, Inc*., 33 F.4th 481, 486 (8th Cir. 2022) (concluding that restrictive covenants on an employee that unreasonably exceeded the employer's valid interest in protecting customers in violation of Arkansas law and were thus unenforceable, the employer could not show likelihood of success or harm). In contrast to the lack of harm of any significant weight to NavSav, the same Nebraska public policy gives

40

weight to the harm Damon will suffer if she is subjected to enforcement of the April Agreement. *See Eggers*, 48 F.4th at 564 (requiring the court to consider the balance between the harm to the movant and the injury to opposing party). Here, "the balance of equities tips in [the movant's] favor." *Tumey*, 27 F.4th at 664 (internal quotation marks omitted).

### F.   The Public Interest

The final factor under both *Winter* and *Dataphase* is whether a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. The public has an interest in enforcing contractual obligations. *Sleep No. Corp.*, 33 F.4th at 1019. On the other hand, the public interest must be considered substantially greater in following a fundamental policy of Nebraska not to enforce or reform unreasonable restrictive covenants. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656. Thus, the public interest also weighs decidedly in favor of the requested preliminary injunction.

Indeed, all factors weigh in favor of the requested preliminary injunction, so the Court will issue it.

### G.   Remaining Matters

Because the Court concludes that a preliminary injunction should issue, the remaining questions are the scope of the preliminary injunction and the appropriate bond for its issuance. As to whom the Court can enjoin, the Court has the authority to grant a preliminary injunction not just against principal actors but also against officers, agents, servants, employees, and attorneys, as well as those persons or entities in active concert or participation with such persons. *See* Fed. R. Civ. P. 65(d)(2); *see also Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). As to what can be enjoined, the Supreme Court has explained that the scope of a preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)

(per curiam). "Part of our consideration is whether the injunctive relief is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Another concern is that the injunctive relief must be "workable." *Id.* (citing *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam)). The Court concludes that the substantive terms of a Preliminary Injunction like the one entered in Beber's and Roach's cases to be consistent with these requirements in this case.

Nevertheless, NavSav argues that if the Court is inclined to grant the preliminary injunction requested, it should limit the injunction to Nebraska-based conduct. Filing 8 at 23. NavSav points out that Beber and Roach admit to selling policies outside of this state, including in Iowa. Filing 8 at 23. NavSav argues that Damon is believed to provide customer support to Beber and Roach. Filing 8 at 23. The Court considers a limitation on the geographic scope of a preliminary injunction against enforcement of the restrictive covenants to be contrary to Nebraska public policy that prevents "blue penciling" of restrictive covenants to make them reasonable. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656.

Turning to the bond requirement, Rule 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court reads this language to make a bond mandatory before a preliminary injunction can issue. Nevertheless, "[t]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v.*

42

*Carroll Elec. Coop. Corp*., 528 F.2d 949, 951 (8th Cir. 1976)). The Court concludes that a $500 bond or $500 cash in lieu of bond is sufficient to satisfy the requirements of Federal Rule of Civil Procedure 65(c) for issuance of a Preliminary Injunction, where Damon's circumstances are different from Beber's and Roach's.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.    Damon's Motion for Temporary Restraining Order, Filing 4, is denied as moot; but

2.    Damon's Motion for Preliminary Injunction, also in Filing 4, is granted.

A separate Preliminary Injunction will issue in this case upon the posting of the security required above.

Dated this 25th day of August, 2023.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

43